# Installation of Slot Machines on
# U.S. Naval Base, Guantanamo Bay

Section 5 of the Anti-Slot Machine Act, 15 U.S.C. § 1175, prohibits the installation or operation of slot machines on any land where the United States government exercises exclusive or concurrent jurisdiction, including military bases outside the United States. This interpretation of the plain words of § 1175 finds support in its legislative history, which reveals that Congress intended it not only to assist the states in enforcing their anti-slot machine laws, but also to establish a uniform federal policy against the use of such gambling devices in areas under federal jurisdiction.

Under the terms of the lease agreement between the United States and Cuba, the U S. Naval Base at Guantanamo Bay constitutes land "acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof" within the meaning of 15 U S.C. § 1175. Accordingly, no slot machines may be installed or operated on that base.

March 29, 1982

MEMORANDUM OPINION FOR THE GENERAL COUNSEL,
DEPARTMENT OF DEFENSE

This memorandum responds to your request for our opinion as to whether § 5 of the Anti-Slot Machine Act, 15 U.S.C. § 1175 (1976), precludes the installation or operation of slot machines at the United States Naval Base at Guantanamo Bay, Cuba. You suggest that the language of § 1175 would appear to prohibit slot machines on the base, but that the underlying congressional intent, as revealed by the legislative history of the provision, was not to exclude slot machines from any foreign military bases, including Guantanamo Bay. For the reasons outlined below, we believe that the language and underlying purpose of § 1175 does preclude the installation or use of slot machines on any federal land where the federal government exercises exclusive or concurrent jurisdiction, including the base at Guantanamo Bay, despite the fact that it is located outside the United States. Accordingly, we conclude that § 1175 would prohibit the installation or use of slot machines at the base.

## I. The Language of Section 1175

Section 1175, Title 15, makes it unlawful to

> manufacture, recondition, repair, sell, transport, possess, or use any gambling device in the District of Columbia, in any possession of the United States, within Indian country as defined in

236

section 1151 of title 18 or *within the special maritime and territorial jurisdiction of the United States as defined in section 7 of title 18.*

(Emphasis added.) Section 7, Title 18, defines the "special maritime and territorial jurisdiction of the United States" to include

> (3) *Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof,* or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

(Emphasis added.) The plain language of the statutes therefore appears to extend the prohibition to military installations under the jurisdiction of the United States.

The base at Guantanamo Bay, as you point out in your letter, operates under an unusual international agreement with the Republic of Cuba which authorizes the United States to exercise complete jurisdiction and control. The Agreement for the Lease to the United States of Lands in Cuba for Coaling and Naval Stations, 23 Feb. 1903, art. III, T.S. No. 418 (Agreement) states in relevant part:

> While on the one hand the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the above described areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement *the United States shall exercise complete jurisdiction and control over and within said areas* with the right to acquire (under conditions to be hereafter agreed upon by the two Governments) for the public purposes of the United States any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof.

(Emphasis added.) Under this Agreement, the United States executed a Lease for Areas for Naval or Coaling Stations, 2 July 1903, United States–Cuba, T.S. No. 426.[1] Thus, under the terms of the Agreement, the Guantanamo Base would constitute land "acquired for the use of the United States, and under the exclusive

---

[1] Article IV of that lease provides:

Fugitives from justice charged with crimes or misdemeanors amenable to Cuban law, taking refuge within said areas, shall be delivered up by the United States authorities on demand by duly authorized Cuban authorities. On the other hand *the Republic of Cuba agrees that fugitives from justice charged with crimes or misdemeanors amenable to United States law, committed within said areas, taking refuge in Cuban territory, shall on demand, be delivered up to duly authorized United States authorities*

(Emphasis added )

237

or concurrent jurisdiction thereof."[2] Accordingly, as this Office has previously found, it would appear to come within § 7's definition of land "within the special maritime and territorial jurisdiction of the United States." Since § 1175 covers land within such jurisdiction, slot machines would seem to be precluded from the base under the language of this provision. Nevertheless, because "[t]he circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect," *Watt* v. *Alaska,* 451 U.S. 259, 266 (1981), it is necessary to examine the legislative history of § 1175 to determine whether Congress passed it with the intent of excluding slot machines from all land under concurrent or exclusive federal jurisdiction.

## II. The Legislative History of Section 1175

The legislative history of § 1175 does not indicate that Congress ever specifically addressed the question whether its terms were intended to embrace property outside the United States but under United States jurisdiction. Since the jurisdictional status of the U.S. Naval Base at Guantanamo Bay is unusual, Congress may have overlooked the possible application of § 1175 to land outside the United States.[3] A brief review of the underlying purposes of the provision, however, suggests that Congress intended exactly what § 1175 says: to exclude slot machines from *all* land on which the federal government exercises exclusive or concurrent jurisdiction, without making any exception merely because the land was outside the territorial United States.

Section 1175 was passed as part of the Anti-Slot Machine Act, 64 Stat. 1135 (1951), whose primary, though not exclusive, purpose was to assist the states in enforcing their anti-slot machine laws. According to the House Report, the use of slot machines had two untoward consequences:

> (1) . . . Nation-wide syndicates appear to derive substantial revenues from the operation of slot machines and similar gambling

---

[2] The fact that the land at Guantanamo Bay is leased rather than owned by the United States does not indicate it was not "acquired" for the use of the United States within the meaning of § 7(3) of Title 18 As the United States Court of Appeals for the Fourth Circuit observed in finding that an embassy leased by the United States was within the "exclusive or concurrent jurisdiction of the United States," "fee simple 'ownership' of the property by the United States is not a prerequisite to such jurisdiction." *United States* v. *Erdos,* 474 F.2d 157, 159 (4th Cir.), *cert. denied,* 414 U.S. 876 (1973). The court noted further:

> [Section 7(3) of Title 18] is not framed in the language of conveyancing. The test, as to property within or without the United States, i[s] one of practical usage and dominion exercised over the embassy or other federal establishment by the United States government.

*Id Cf. United States* v. *Schuster,* 220 F. Supp. 61 (E.D. Va. 1963) (leased property for U.S naval base in Virginia constitutes land "purchased or otherwise acquired by the United States" within the meaning of 18 U.S.C. § 7(3)).

[3] As you note in your request, the House and Senate reports on the Act did comment that § 5 covered "parts of the United States where the Federal Government is primarily responsible for the enforcement of the criminal laws," S. Rep. No. 1482, 81st Cong., 2d Sess. 2 (1950); and "those parts of the United States which are under the jurisdiction of the Federal Government." H. Rep No. 2769, 81st Cong., 2d Sess 2 (1950). There is no indication from these references to the "United States," however, that Congress ever even considered the possible application of § 1175 to land outside the United States, let alone that it specifically intended to exclude § 1175's coverage from such territory, and the Members of Congress who spoke on the floor recognized no such geographic limitation *See* 96 Cong. Rec 13644 (1950) (remarks of Rep. Rogers) (the law covers "those places where the Government has jurisdiction"); 96 Cong. Rec 13646 (1950) (remarks of Rep. Wolverton) (law prohibits "gambling devices within Federal Territorial jurisdiction").

238

devices, and appear to put these revenues into other illegal enterprises with the resulting increase in crimes committed and corruption of public officials, all of which endanger our society; and

(2) slot machines and similar gambling devices appear to offer an opportunity for a particularly vicious form of gambling which "does not give the sucker (many of whom incidentally are juveniles) a decent break."

H. Rep. No. 2769, 81st Cong., 2d Sess. 5–6 (1950). Thus, in § 2 of the Act, Congress prohibited the interstate shipment of slot machines to any state which had a law prohibiting their use. 15 U.S.C. § 1172. In addition, under § 5, it prohibited the manufacture, use, sale, or possession of slot machines on any land under the maritime and territorial jurisdiction of the United States. According to the Senate Report, the prohibitions on transportation of slot machines would

support the basic policy of the States, which outlaws slot machines and similar gambling devices, by prohibiting the interstate shipment of such machines except into States where their use is legal. By way of additional support, foreign import or export of these machines is prohibited and their manufacture, possession, and *use is forbidden in those parts of the United States where the Federal Government is primarily responsible for enforcement of the criminal laws, such as the District of Columbia.*

S. Rep. No. 1482, 81st Cong., 2d Sess. 1–2 (1950) (emphasis added).[4]

If the *only* purpose of the Anti-Slot Machine Act had been to assist the states in the enforcement of their restrictions on the use of slot machines, one could argue with some force, as you have in your letter, that a prohibition on the use of slot machines in an overseas base such as Guantanamo Bay would not directly further the purposes of the Act. Although the use of slot machines at an overseas base might have some remote relationship to violations in the states, it would not be as likely to undermine the states' enforcement of anti-slot machine laws as the use on federal land within the United States.[5] We need not resolve whether this indirect effect would have led Congress to exclude slot machines from Guantanamo Bay, however, because the legislative history of the Act clearly reveals that Congress had a related but distinct purpose in passing § 1175. Because of

---

[4] The House Report expressed a similar understanding:

The primary purpose of this legislation is to support the policy of those States which outlaw slot machines and similar gambling devices, by prohibiting use of the channels of interstate or foreign commerce for the shipment of such machines or devices into such States. In addition the legislation
. prohibits the manufacture, sale and use of slot machines and similar devices in those parts of the United States which are under the jurisdiction of the Federal Government.

H. Rep. No. 2769, 81st Cong., 2d Sess 2 (1950).

[5] The recommendations of the Attorney General's Conference on Organized Crime, which were excerpted in the Senate Report on the bill, specifically referred to the "troublesome problems concerning slot machines in, or emanating from, certain areas where the Federal Government exercises exclusive criminal jurisdiction." S Rep. No. 1482, 81st Cong., 2d Sess 2 (1950).

Congress' concern about the use of slot machines, and its desire to establish a uniform federal policy, it intended to prohibit slot machines from *all* land over which the federal government had jurisdiction, regardless of whether this prohibition would have an effect on the states' enforcement of the anti-slot machine laws. This separate purpose is revealed in the congressional comments on three provisions of § 1175.

First, as suggested above, § 5 of the Act prohibited the possession or use of slot machines on federal land in *all* of the states, *even where the land was located in a state that permitted slot machines*. The presence of slot machines on this federal land would not undermine the policies of these states, although it could conceivably have some indirect impact on the ability of anti-slot machine states to exclude their interstate transport. The Senate Report justified this restriction on the ground that a federal policy against slot machines on federal land should be uniform.

> With regard to Federal reservations within the States, while it is generally true that the laws of the States would govern for those areas (*see* 18 U.S.C. 13), nevertheless it will be useful to have an unmistakable Federal policy in regard to these areas; and it would seem that *Federal policy in regard to gambling devices ought to be uniform even in those few States which might regard as legal some or all of the forbidden operations.*

S. Rep. No. 1482, 81st Cong., 2d Sess. 4–5 (1950) (emphasis added). Similarly, Senator Johnson, the Chairman of the Committee on Interstate and Foreign Commerce, which had reported the bill, explained on the floor that the prohibition on possession of slot machines on federal property reflected not only a desire to assist the states, but also a congressional device to outlaw such machines because their use was undesirable.

> [A]s to Federal property, the bill does prohibit the possession or use of slot machines. Frankly, I do not see how the Congress can prohibit the interstate shipment of devices which everybody acknowledges as "one-armed bandits" which do not give the customer an even break, and at the same time permit and encourage their operation on Federal territory. *If such machines are bad, they are bad, and we have no business exempting Federal property from the bill and thus make every Army post or officer's club a gambling oasis.*

96 Cong. Rec. 15108 (1950) (emphasis added).

Congressional debate on the possession and use of slot machines on American ships further reveals a congressional intent to exclude slot machines from all "land" under federal jurisdiction. Although the original House draft of the Act had only covered land under the "exclusive or concurrent jurisdiction" of the United States, the House amended § 5 to cover land under the special maritime jurisdiction, so as to assure slot machines were prohibited from American ships.

240

*See* 96 Cong. Rec. 13650 (remarks of Rep. Heselton). In explaining the Committee amendment on the floor, Representative Heselton justified the prohibition based not on its effect on state laws, but on the need for a uniform federal policy against use of such gambling devices under federal jurisdiction.

> [I]t was my opinion and I think it was the opinion of the members of the committee that if we were going to do anything with this bill insofar as transportation is concerned, it was highly illogical for us to tolerate and exempt an operation under the American flag, where this Congress has jurisdiction and responsibility. We prohibit the use of these one-armed bandits in the District and in the Territories and possessions, with the exception of Alaska and Hawaii, so far as their legislation may exempt themselves. Then we were asked to ignore the one other place which is considered American soil, and subject to the laws of the United States, and that is American shipping. *If it is bad in one instance it is bad in all. We should not go halfway in this effort.*

96 Cong. Rec. 13651 (1950) (emphasis added).

Finally, Congress' intent to prohibit all slot machines in areas within federal jurisdiction is evidenced by its rejection of an amendment which would have specifically exempted social clubs on military bases from the prohibition on slot machines. Representative Sutton proposed the amendment because he believed that use of slot machines in this controlled environment did not create the same potential for abuse as civilian uses. He stated:

> [This amendment] is not in contradiction to the purposes of the bill at all. When the bill was written they provided on page 5 a prohibition against the use or possession of slot machines in all phases on land reserved or acquired for the use of the United States, which includes, of course, Army camps, Navy camps, and Marine camps. It is common knowledge to anyone who has in any way been connected with the Armed Forces that your clubs are operated by the money received from slot machines.
> In view of the questions that have been raised about gamblers going in and taking their haul out of the rental fee, I want to say this: Under this amendment these machines have to be owned by the enlisted men's club, the noncom clubs, and the officers' clubs before they would be permissible. Then they are only used for amusement purposes and to equip the club where they, the enlisted men and officers, spend their spare time. I am just as opposed to gambling as anyone, but if a soldier can get his mind off of the horrors of war and still have what little money he may lose used for his own enjoyment to equip the club, the matter is somewhat reconciled.

241

96 Cong. Rec. 13651 (1950). Opposition to this amendment was successfully led by Representative Christopher, who argued as follows immediately before the House voted the amendment down:

> We would be in a very indefensible position here if we were to say it is wrong to have a slot machine in a restaurant, it is wrong to have a slot machine in a hotel, it is wrong to have a slot machine even in a beer joint, but it is perfectly all right to have one in the PX or in the officers' club or where our boys meet together evenings. It is all right for them but it is wrong for everybody else. I could not face the mothers in my district if I supported such an amendment—absolutely I could not do it.

96 Cong. Rec. 13653 (1950).

Thus, the congressional debates on the application of § 1175 in these other contexts reveal that, although the predominant purpose of the Act may have been to assist in the enforcement of anti-slot machine laws of the states, Congress was disturbed by the use of slot machines in any area under its jurisdictional authority and intended to prohibit machines from all land over which the federal government exercised exclusive or concurrent jurisdiction, regardless of the effect on the operation of state laws. Accordingly, we believe that Congress intended, as the language of § 1175 indicates, to preclude the installation or use of slot machines on any land under exclusive United States jurisdiction, and that this prohibition extends to the U.S. Naval Base at Guantanamo Bay because of the lease terms which grant the United States "complete jurisdiction and control over" that property.[6]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[6] In your request, you note that most other foreign military bases are not within the "exclusive or concurrent" jurisdiction of the United States, because, under the agreements between the host country and the United States for these bases, "our status is that of either lessee or licensee." Because we have not been asked about the use of slot machines on other bases, and because the slot machine prohibition is dependent upon the terms of these agreements with the host countries, we express no opinion as to whether the use or possession of slot machines would be prohibited.